## Maxwell *v.* Hill.

### (*Nashville.* February 10, 1891.)

1. WILL. *Proof of signature of deceased subscribing witness.*

   When subscribing witness to will is dead, proof of his signature by persons familiar with his handwriting is allowed in lieu of his testimony.

   Code construed: §§ 3012, 3018 (M. & V.); §§ 2171, 2172, 2178 (T. & S.).

   Cases cited and approved: Stump *v.* Hughes, 5 Hay., 93; Haggard *v.* Mayfield, 5 Hay., 121; Crockett *v.* Crockett, Meigs, 95; Jones *v.* Arterburn, 11 Hum., 97; Harrel *v.* Word, 2 Sneed, 611; Alexander *v.* Beadle, 7 Cold., 126.

2. SAME. *Subscribing witness not "interested in the devise of land," when.*

   A subscribing witness to a will is not "interested in the devise of land" therein disposed of, in such sense as to disqualify him and render the will void, where his interest in the devised land was acquired after the testator's death by inheritance from the devisee.

   Code construed: §3003 (M. & V.); §2162 (T. & S.).

   Cases cited and approved: Allen *v.* Allen, 2 Overton, 172; Walker *v.* Skeene, 3 Head, 1–5.

3. WILL. *Testator's knowledge of contents of will. Presumed, when.*

   On trial of issue of *devisavit vel non* it will be presumed, in the absence of any circumstances calculated to excite suspicion, that testator had full knowledge of the contents of his will, where its proper execution and his capacity to make it have been satisfactorily proved.

   Cases cited and approved: Cox *v.* Cox, 4 Sneed, 87; Bartee *v.* Thompson, 8 Bax., 513; Patton *v.* Allison, 7 Hum., 332; Rutland *v.* Gleaves, 1 Swan, 200.

4. SAME. *Same. Must be proved, when.*

   But this presumption, that testator had knowledge of contents of will, is rebutted and the burden cast upon the proponent to show affirma-

tively that the testator fully understood and freely assented to the provisions of the will, where any circumstances tending to excite suspicion have attended its execution.

Cases cited and approved: Rutland *v.* Gleaves, 1 Swan, 200; Bartee *v.* Thompson, 8 Bax., 513; Key *v.* Holloway, 7 Bax., 575; Wisener *v.* Maupin, 2 Bax., 342; Cox *v.* Cox, 4 Sneed, 87; Waterson *v.* Waterson, 1 Head, 2.

5. SAME. *Same. Examples of suspicious circumstances.*

The fact that testator was so illiterate that he was compelled to make his mark, united with the further fact that the draughtsman of the will is the principal beneficiary under it, are sufficient in such case to rebut the presumption of testator's knowledge of contents of will, and to impose upon the proponent the burden of proving knowledge affirmatively.

6. SAME. *Same. What proof to show testator's knowledge.*

And, in such case, it is sufficient if it be affirmatively shown by any competent evidence that "testator was fully cognizant of the contents of the will and approved it," and that its execution was "fair and free from fraud and undue influence." It is not essential that the proof should be equivalent to the reading of the will to testator by a *disinterested* person.

7. SAME. *Same. Testator's declarations competent to show knowledge.*

Testator's declarations, whether made before or after the execution of his will, with reference to the dispositions he proposed to make or had made of his property, are competent evidence to show whether or not he fully comprehended and approved the will as written.

Cases cited and approved: Beadles *v.* Alexander, 9 Bax., 604; Linch *v.* Linch, 1 Lea, 526.

8. SAME. *Same. Case in judgment.*

The will in this case, though signed with a mark and drawn by the principal beneficiary, is sustained by the proof.

9. SUPREME COURT PRACTICE. *No reversal for meager charge.*

This Court will not reverse for meagerness of the charge of the lower Court, if it was correct so far as it went, and there was no request for *additional* instructions.

Maxwell *v.* Hill.

Cases cited and approved: Sutherland *v.* Shelton, 12 Heis., 374; Railroad *v.* Jones, 9 Heis., 27; Overton *v.* Bolton, 9 Heis., 762; Sommers *v.* Railroad, 7 Lea, 201; Railroad *v.* Gurley, 12 Lea, 46; Knoxville *v.* Bell, 12 Lea, 157; Railroad *v.* Wynn, 88 Tenn., 332; Railroad *v.* Foster, 88 Tenn., 671; Watterson *v.* Watterson, 1 Head, 6; Mann *v.* Grove, 4 Heis., 403; Railroad *v.* King, 6 Heis., 269.

## FROM RUTHERFORD.

Appeal in error from Circuit Court of Rutherford County. ROBERT CANTRELL, J.

C. A. SHEAFE and JOHN E. RICHARDSON for Maxwell.

PALMER & PALMER and P. P. Mason for Hill.

CALDWELL, J. This is a contested will case. In 1877 Elvy A. Hill, wife of C. A. Hill, died at her home in Rutherford County. At the time of her death she owned four tracts of land and some little personal property. She died without child or representative of a child, and without father or mother, but left surviving several brothers and sisters and her husband.

At the February Term, 1878, of the County Court of Rutherford County, her husband, C. A. Hill, presented a paper-writing, which was admitted to probate in common form, as the last will and testament of Elvy A. Hill, deceased.

By this instrument some small bequests—a saddle and her wearing apparel—were given to her sister, Sarah Maxwell, and to his sister, Eliza Haynes, and the residue of her personal estate and all her lands were given to her husband absolutely.

In April, 1888, Sarah Maxwell, a sister of Elvy A. Hill, filed her petition in the County Court to have the probate set aside. C. A. Hill answered the petition, and, proper order being made, the alleged will and proceedings thereon were certified to the Circuit Court, where issue of *devisavit vel non* was made up and tried by Court and jury. Verdict and judgment were for the will, and, motion for new trial being overruled, Sarah Maxwell appealed in error.

The subscribing witnesses to the paper propounded as the will were W. J. Hill and O. W. Hill, brothers of C. A. Hill. The former of these died before the trial in the Circuit Court, and, because of his death, his handwriting and signature were properly allowed to be proved by other witnesses. Code (M. & V.), §§ 3012 and 3018; Caruthers' History of a Lawsuit (Martin's Edition), Sec. 612; 5 Hay., 93 and 121; Meigs, 95; 11 Hum., 97; 2 Sneed, 611; 7 Cold., 126.

C. A. Hill, the principal beneficiary under the alleged will, also died before the trial intestate and without children or child, or representative of either. O. W. Hill is one of his heirs; hence, when he went on the stand to prove the execu-

tion of the will as one of the subscribing witnesses, his evidence was objected to by the contestant on the ground of interest. His evidence was admitted, and the action of the trial Judge in that behalf is here assigned as error.

The witness was competent, and his evidence was properly admitted. The statute relating to this question provides that "no last will or testament shall be good or sufficient to convey or give an estate in lands unless written in the testator's life-time, and signed by him, or by some other person in his presence and by his direction, and subscribed in his presence by two witnesses, at least, neither of whom is interested in the devise of said lands." Code (M. & V.), § 3003.

O. W. Hill was manifestly not "interested in the devise" of the lands of the testatrix, though made to his brother. To have been so in the sense of the statute, he must have been a beneficiary under the devise. He had no *interest in the devise* at the time he witnessed the will, nor has he any now. His. interest in the land now is as heir of his brother, and not as devisee under the will. At that time he was not even heir of his brother, for no one can be heir of a living person. This construction of the statute is in accord with *Allen* v. *Allen*, 2 Overton, 172, and *Walker* v. *Skeene*, 3 Head, 1–5.

Elvy A. Hill was an illiterate person, and made her mark to the supposed will. At the time it was executed she was about fifty-five years of age,

and in rather feeble health. Her husband was both draughtsman of the instrument and almost the sole beneficiary thereunder. As applicable to these facts, in connection with what occurred when the paper was executed, and before and afterward, the Court instructed the jury as follows: "You must further be satisfied that she was fully apprised of the contents of the will—that it was read over to her, and that she understood the same; also that it was her free and voluntary act, free from fraud or coercion on the part of the husband. You must also find that she was of sound mind and disposing memory at the time of making the will; that she knew her property, her relations, and those having claims to her bounty, and had mind to intelligently dispose of said property. * * * Where a beneficiary under a will is the draughtsman of the will it is a strong circumstance against it, and it devolves upon the plaintiff to show that every thing was fair and free from fraud and undue influence. When a party makes his or her mark to a will, it is not enough to show that the will was duly executed, but it must also be shown that the testator was fully cognizant of the contents of the will, and approved it."

Appellant assigns error on this charge, and insists that it is fatally defective, because the jury were not told that "information acquired from the draughtsman in such a case as this is not sufficient," and that, "under the circumstances of this case,

the proof should be equivalent to having heard the will read over by a disinterested person."

In ordinary cases, where the testator is shown to be of competent capacity, and there are no circumstances of suspicion surrounding the case, it is not necessary to establish by proof that he had knowledge of the contents of the will. Such knowledge will be presumed where formal proof of execution and testable mind are shown, and no opposing facts appear. *Cox* v. *Cox*, 4 Sneed, 87; *Bartee* v. *Thompson*, 8 Bax., 513; *Patton* v. *Allison*, 7 Hum.; 332; *Rutland* v. *Gleaves*, 1 Swan, 200; 1 Greenleaf on Evi., Sec. 33; 1 Jarman on Wills, 46.

But where the person making the will is so illiterate as to make his mark, and the draughtsman of the will is the principal beneficiary, the presumption of knowledge is overcome, and more proof is required to establish the will. Such circumstances cast a suspicion on the will, and it becomes incumbent on the proponent to remove that suspicion by showing affirmatively that the testator fully understood the provisions of the will and freely approved them. Such is the rule deducible from the following authorities: 7 Hum., 332–335, and citations; 1 Swan, 200; 8 Bax., 513; 7 Bax., 575; 2 Bax., 342; 4 Sneed, 87; *Watterson* v. *Watterson*, 1 Head, 2.

In *Rutland* v. *Gleaves*, *supra*, the testatrix was old and feeble, and had for several years been addicted to the excessive use of opium and ardent spirits. The will, which was complicated in its

provisions, was read to her, partly by the witness and the balance by another person, who was the principal legatee; after which the latter held her hand and she made her mark to it. "The Court, amongst other matters not excepted to, instructed the jury 'that if they believed the will was read to the testatrix correctly, and that she was of sound mind, the legal presumption would be that she understood its contents.'" This instruction was held to be erroneous, because it precluded the jury from considering all the facts, and determining from them whether or not the testatrix understood the contents of the will. 1 Swan, 200.

In the 7 Humphreys case the Court told the jury "that, where a party writes a will in his own favor, this circumstance should awaken the vigilance and jealousy of the jury to see whether a knowledge of its contents was brought home to the deceased; for, in such case, it is incumbent on the propounder to show that the contents were known to the testator." This was held to be "a correct statement of the law." 7 Hum., 332.

In *Cox* v. *Cox* the testatrix was shown to be so illiterate that she could neither read nor write. She was also very old when the will was executed, and was by the witness seen to "make her mark" to it. As to the rule of evidence in such a case this Court said: "The existence of the fact that the testator cannot read, the law regards as a circumstance not only sufficient to excite suspicion, but to repel the presumption of knowledge of the

contents of the will. It may be of more or less force, according to the facts of each particular case; and the degree of proof requisite to remove such suspicion, and to establish the knowledge of the testator, must necessarily depend upon the circumstances of each case. All that in reason can be necessary is that it shall be made to appear to the entire satisfaction of the jury that the testator fully understood and assented to the provisions of the will." 4 Sneed, 88.

In the Watterson case the testatrix was unable to write or read writing. She had two sons. One of these wrote the will, by which almost her entire estate was given to himself. Judge Caruthers, delivering the opinion of the Court, said there were two grounds of suspicion and distrust —the illiteracy of the testatrix, and the fact that the will was written by the principal legatee. And, in the conclusion of his discussion of the charge of the trial Judge with respect to the evidence required in such a case, he uses this language: "But we think there is no inflexible rule of law that the knowledge of the contents which is required to be established in the case of persons who cannot read, or where the writer of the will gets a large benefit under it, can only be derived from hearing the will read, to be proved either by direct or circumstantial evidence; but all that is necessary is that it must appear to the full and entire satisfaction of the jury that the testator fully understood and freely assented to the pro-

visions of the will. This fact, as to the kind and description of proof, may be made out like any other disputed fact. But, in a case of this description, the strength and conclusive character of it must depend upon the degree of suspicion which the circumstances are calculated to excite, and should be strong and convincing—equivalent at least to the reading of the will, or hearing it correctly read." 1 Head, 6, 7.

None of these cases, nor any other authorities of which we are aware, warrant the instruction which appellant insists should have been given.

The head-note in the Watterson case is misleading, in that it states that the evidence of the testator's knowledge, in suspicious cases, should be "equivalent, at least, to having heard the will read by a *disinterested* and *unimpeachable* party," when the language of the opinion is that such evidence should be "equivalent, at least, to the reading of the will, or hearing it correctly read." A party who is neither disinterested nor unimpeachable might "correctly read" the will. Whether he has done so, in a given case, is a question for the jury.

In all cases of illiteracy on the part of the testator and of great benefit to the writer of the will, the controlling idea, beyond the ordinary proof of formal execution and testable capacity, is that the testator must have fully comprehended the provisions of the will, and freely given his assent thereto. To show this affirmatively, the burden is

38—5 P

upon the proponent. It may be shown by any competent evidence, direct or circumstantial, which is sufficient in weight and cogency to remove all suspicion and satisfy the jury of the fact.

The instruction given in this case comes fully up to the rule in every respect. Summarized on this. point it is, that, to find in favor of the will, the jury must be satisfied that the testatrix was fully apprised of its contents; "that it was read over to her, and that she understood the same;" that she "was fully cognizant of the contents of the will and approved it."

Not only was the charge given full and as favorable to the contestant as could have been within the law, but the instruction suggested, for the first time, in the assignment of errors is not sound. But if the charge were not full (being correct as far as it goes), and the instruction suggested were entirely sound, the failure to give it would not be reversible error. To be so, it must have been asked in the form of an additional instruction in the Court below. Mere meagerness in a charge is not ground for reversal. 12 Heis., 375; 9 Heis., 27; *Ib.*, 762; 7 Lea, 201; 12 Lea, 46; *Ib.*, 157; 14 Lea, 65; 4 Pickle, 332, 671, 710; 1 Head, 6; 4 Heis., 403; 6 Heis., 269.

Finally, it is assigned as error, and contended in . argument, that "there is no testimony in the record to justify the finding of the jury." Several witnesses say they heard the testatrix . state at various times before the execution of her will that

she desired her husband to have her land for life, with remainder to her brothers and sisters. Others state, with equal certitude, that they heard her say before the date of the will that she wanted him to have it absolutely, and did not want her "folks" to have any interest in it. Some of the witnesses testify that she told them, after its date, that she had made her will, giving her property to her husband. That he was kind and affectionate to her is sufficiently shown. There is some evidence tending to show that she was not on good terms with her own people, and that they had been unkind to her; and, on the other hand, there is evidence tending to show that this is not true.

Her declarations were competent to be considered by the jury in determining whether she fully comprehended and approved the will as written. *Beadles* v. *Alexander*, 9 Bax., 604; 1 Lea, 526. If it be found that she did, then, of course, the will and not her verbal statements must control the course of her property.

We notice more- in detail the testimony of O. W. Hill, one of the subscribing witnesses. He says: "I went to her house and went in. Her husband was out of the room. She picked up a paper, and said it was her will; told me she had signed it, and showed me her mark. She said she had willed my brother every thing she had, except side-saddle and some clothes. I witnessed the will. * * * This is the will [being shown the original will on file]. * * *

When I first went there she was in the house. My brother, Kit [C. A. Hill, her husband], came in after I got there, before I witnessed the will. He took the will up and read it in the presence of myself and Elvy Hill, at my request. I never sign any thing without having it read. The will read over was the same as what she had told me. I know C. A. Hill's handwriting. This will was in his handwriting. I said to her that it looked like some one else ought to have written it. She said my brother always done her writing, and could do that. He did writing for her both before and after they were married," etc.

If this witness speaks the truth (his credibility was peculiarly a question for the jury), there can be no doubt that the testatrix understood and approved the will. She told him what it contained before it was read in their joint presence; and when he heard it read he found it to be the same as she had previously told him it was; and when the will is produced in Court it is seen to be what she told him it was, and as it was read to them by the draughtsman.

Altogether, the verdict is abundantly sustained.

Let the judgment be affirmed with costs.